LEIGH M. CLARK, Retired Circuit Judge.
Appellant-defendant was convicted of burglary in the second degree and sentenced to imprisonment for a term of five years.
The dwelling house alleged to have been burglarized was that of Charles M. Beck at 208 Woodall Street, Albertville. Mr. Beck testified that he and his family went on a vacation commencing about May 20, 1976, and continuing for about ten days. No one was left at the house except Mr. Beck’s father, who had a room of his own at the house and lived there. Upon the return of Mr. Charles Beck from the vacation, he learned that three hand guns were missing, described by him as a “357 Magnum,” a “9 *1026 mni. Smith & Wesson automatic,” and a “32 Smith & Wesson” revolver. The 32 revolver was usually kept by Mr. Beck’s father in the room occupied by him. The 357 Magnum and 9 mm. Smith were usually stored in the bottom compartment of Mr. Beck’s gun cabinet. Upon his return from the vacation, his father let him know that the 32 revolver was missing. They made a search for it and during such search, Mr. Beck found that the other two guns had disappeared from the gun cabinet. He said:
“The bottom two doors had been pried open with something. The lock had just been bent over. The door was still shut, but when we started to go to get a gun out of it I noticed that the door had been pried open. Some flat instrument had been used to pry it open.”
He noted that three boxes of ammunition, one of 9 mm. and two of the 357, were missing from the gun cabinet in addition to the pistols.
Mr. Charles Beck further testified that defendant had been in his home on occasions when Mr. Beck was cleaning his guns and he would show the guns to defendant, and they would discuss them. He said his father had a key to the house. His father worked and would usually leave the house at approximately 6:30 in the morning, each day except Saturday and Sunday, and remain away until approximately 3:45 in the afternoon. Mr. Charles Beck promptly reported the disappearance of the pistols to the police and gave the police the serial numbers of the guns.
Mr. Maymon Beck, the father of Charles M. Beck, testified that the last time he saw the 32 revolver was on the first Monday after the Friday on which his son and family commenced their vacation. He said he noticed it after he returned from work Monday afternoon, that he worked five days a week commencing on a Monday. He said that during the immediately preceding weekend, his other son, Fred, and family had visited him. On Wednesday evening, after discovering that the 32 was missing, he called Fred in Georgia and told him the gun was gone. The witness further testified that on leaving the house for work he locked all the doors and saw that the windows were closed and that upon returning to the house there was no signs of physical entry into the house by way of the doors or windows. He had a key to the house and understood that it was the only key to the house.
Mrs. Charles M. Beck testified that before the family left on their vacation, she left a key to the house with Mrs. Berry, the mother of defendant, with instructions that she let the dog out. She also left with Mrs. Berry her “old money, coin collection,” which she took to Mrs. Berry’s house as she left and received it from her upon her return from the vacation.
All of the three missing guns were recovered, were definitely identified and admitted in evidence.
Reggie Lambert testified that he worked with defendant and in October 1976 they discussed guns. During the conversation, Lambert let it be known that he wanted to buy a gun. He bought the 357 Magnum from defendant on October 29, 1976, paying him fifty dollars in cash and giving him a check for fifty dollars. The particular gun was recovered from the witness by Detective Cole of the Albertville Police Department, after Lambert had called the Sheriff’s Department and had it run a check on the gun.
Jim Lessley, Jr., testified that during the summer of 1976, defendant mentioned to him that he had a 9 mm. automatic “that he had acquired in Michigan and he was wanting to sell it.” They went to defendant’s home to get the gun. They went to the bank and the witness made a withdrawal of eighty-five dollars and paid defendant that amount for the 9 mm. gun that the evidence shows was missing from Mr. Beck’s gun cabinet. This was on July 12 or 13. Upon learning of defendant’s arrest, Less-ley turned the gun over to the Albertville Police Department. The witness had made several checks to attempt to determine whether the gun was a stolen one and had been unsuccessful. He learned that the gun had been stolen about the time that he learned of defendant’s arrest.
*1027 Chief of Police Bearden, of Geraldine, Alabama, testified that on November 2,. 1976, he saw defendant in Geraldine driving a black-over-yellow Plymouth. There were two others in the car with defendant. After the car stopped, he approached the automobile and arrested one of the individuals, Gary Wayne White, for possession of a pistol, which was “stuck down in his britches.” At the time, defendant said that the automobile belonged to him. The pistol was identified as the 32 revolver that was missing from Mr. Beck’s house or from the room occupied by Mr. Maymon Beck.[1]
Mr. John William Berry, the father of defendant, who lived at 1010 Woodall Street, Albertville, across the street from Mr. Charles M. Beck, testified as to the cordial relations between the members of his family and the Becks. He said he recalled the occasion of the vacation by Mr. Charles Beck and his family in May 1976, and that Mrs. Beck and one of the sons brought over a box which was supposed to contain coins and left it at the Berry house, and that they left a key to the Beck house. He said he did not use the key, that he never saw Michael, who is twenty-eight years old, ever go into the Beck house while they were on their vacation. He saw his wife go in the house once. He said that he did not see Mr. Maymon Beck go in the house during the vacation period, that Mr. Maymon Beck’s room was a room they had made for him in the garage. He saw Mr. Maymon Beck around the place while Mr. Charles Beck was on vacation, and he talked with him. He also saw Fred Beck and his family in or around the Beck home. They came on the Friday that Mr. Beck left and they left on Sunday about 3:00. On the day of Michael’s arrest, Mr. Berry had a conversation with Mr. Charles M. Beck about a man who was the third person in the automobile when the 32 revolver was found on the person of Gary White at Geraldine. He revealed to Mr. Beck that Michael had said that he obtained the gun from such third person, and said Mr. Beck said that he knew the man well and “he’d steal anything.” He said that he had not seen Michael in possession of any pistols. Michael was living with his parents at the time.
Mrs. Ruby Berry, the mother of Michael, testified that the Becks brought a large box containing coins to her to keep while they were on their vacation, and further asked if they could leave some guns at her house, but that they did not leave the guns, that Mr. Beck said they would be all right just where they were. Mrs. Beck left a key to their house with her and asked her “to take their mail in and leave it in the living room, and let the dog out, if she would come out with me.” She went to the house every day the postman ran. She attempted to let the dog out, but it growled so that she “left her alone after that one try.” She never saw Michael go into or about the Beck home, nor did she ever see her husband go into or about the Beck home. She saw Fred Beck and family when they visited Mr. Maymon Beck, saw them going in and out of the house. They stayed there no more than two days. From the time that the Becks went on their vacation she had not seen Michael in possession of any pistol. She kept the key to the Beck home on the “keyboard in my kitchen, on the wall.” She never at any time while the Becks were on vacation noticed that the key was missing from the key ring. No one ever asked to borrow the key and she never gave anyone the key. She was not at home all the time while the Becks were on their vacation. She would leave the house at times to go shopping. She relocked the door of the Beck home every time she entered it.
Appellant urges that if the indictment had charged grand larceny instead of burglary the evidence of defendant’s possession of the recently stolen property “might have warranted a conviction,” but that the evidence is not sufficient to warrant a convic *1028 tion of burglary in the second degree. We held in Breazeale v. State, 51 Ala.App. 320, 285 So.2d 130, 132, cert. denied 291 Ala. 774, 285 So .2d 134 (1973):
“The position has been repeatedly taken by this Court and by other courts that upon proof that a burglary has been committed, the possession soon thereafter of goods stolen in the burglary affords a logical inference, in the absence of a satisfactory explanation of the possession, that the possessor was the burglar. Wildman v. State, 42 Ala.App. 357, 165 So.2d 396; Miller v. State, 43 Ala.App. 287, 189 So.2d 576; Rutherford v. State, 48 Ala.App. 289, 264 So.2d 210, cert. denied 288 Ala. 750, 264 So.2d 214. The rule applies alike to burglary and larceny, and it seems clear that the kind of possession required to form a basis for an inference of guilt is generally the same as to the two crimes. . . . ”
Appellant also contends that to support a conviction of burglary it is necessary to show a “breaking” and entering. We agree. Appellant asserts that there was no evidence of a breaking. We disagree.
A breaking into a residence by unlocking a door is a sufficient breaking to constitute that element of the crime. Creel v. State, 23 Ala.App. 241, 124 So. 507, cert, denied, 220 Ala. 220, 124 So. 510 (1929); Norman v. State, 13 Ala.App. 337, 69 So. 362 (1915).
In Norman, we find many circumstances paralleling the facts in this case. In some respects the evidence was stronger against the defendant in Norman than it was against the defendant in instant case, but in other respects it was weaker.
In Norman, the conviction of defendant of burglary of an office at the State Capitol was upheld. It was charged that he had broken and entered into the office' with the intent to steal. The office was that of the State Health Officer, where “answers” had been left in connection with an “examination” then in the process of being conducted of applicants for admission to the practice of medicine. The defendant was a physician who had been admitted to the practice. The evidence was to the effect that for a stipulated sum defendant agreed to tell the applicant how to answer the questions, supervise his answering them and then would substitute such answers for the answers that the applicant had given and left at the office of the State Health Officer a few hours before, at about the closing time of the office on a Thursday afternoon. Before the following night the second set of answers of the applicant arrived in the office of the State Health Officer, and that night defendant delivered to the applicant his original answers. The court said:
“How did the defendant come into the possession of these originals? Being, as they were shown by the evidence for the state to be, stolen property, the mere fact of defendant’s possession of them, aside from the other mentioned incriminating evidence against him, was sufficient, in the absence, as here, of any explanation on his part as to how he came by that possession, to afford a reasonable inference that he had stolen them from the office of Dr. Sanders [the State Health Officer] (Hicks v. State, 99 Ala. 169, 13 So. 375; Fuller v. State, 48 Ala. 273; 1 Mayf.Dig. 138, § 16); but whether by breaking into and entering said office, which is the sole charge here (burglary), a belief of which breaking and entering was essential to defendant’s conviction, or whether by entering said office without a breaking, which would make defendant guilty of only petit larceny, is the serious question in the case, though we are of opinion that the evidence was sufficient in its inferences to require a submission of the question of the breaking to the jury, and to forbid the giving of the affirmative charge for defendant.
“It is true that there is no evidence whatever of an actual or violent breaking, and consequently true that, if there was a breaking, it was a breaking by unlocking, rather than by battering open, the door to the office; yet such a breaking is entirely sufficient to constitute a ‘breaking’ within the contemplation of the law in defining burglary. 6 Cyc. 178 et seq.; 1 Mayf.Dig. 134, § 12.
*1029 “It is further true that certain phases of the evidence afford such latitude,as to the time of the taking as not to more definitely fix such time than that inferentially it must have occurred some time between Thursday night, when defendant agreed with Avery to get said papers, and Friday night following, when defendant delivered said papers to Avery, thereby, without more, leaving perhaps as strong room for an inference that defendant stealthily took said papers from the office of Dr. Sanders during the day of Friday at a time when such office was open and without breaking therein, as for an inference that he took them on the Thursday night before, and after said office had been closed, and by breaking into it by unlocking it with a key; yet the further fact, which also appears in evidence, that at all times when said office was open there was always some one of those who had charge of it in there, is a strong circumstance tending to rebut, in connection with other circumstances, the idea that the papers were taken from that office during the time that it was open, and tending to show that they were taken by breaking into said office when it was closed, and was sufficient, therefore, with such other circumstances, to authorize the court to submit to the jury the question as to whether or not defendant broke into and entered said office. Pantaze v. West, 7 Ala.App. 599, 61 So. 42.”
We find the contention of appellant in Norman to be significantly similar to that of appellant in instant case. It-is possible that defendant, or someone other than defendant, obtained the pistols without having used the key left with the mother of defendant, but it seems unlikely. Certainly the testimony of the mother is to the effect that each time she opened the door nothing like that occurred. It is also possible that someone went through an open door after it had been opened by Mr. May-mon Beck upon his return from work, but any likelihood thereof dims in the light of the greater likelihood that, if Mr. Beck had been home, he would have heard the forced entry into the gun cabinet. It is hardly likely that someone would have entered the house with the intent to steal at a time when Mr. Maymon Beck was there instead of at a time when he was absent. The doors were locked and the windows closed while Mr. Beck was away, but the key was readily available to defendant, in whose possession the stolen property was found.
There were only two keys to the house in the neighborhood, one in the possession of Mr. Maymon Beck and the other left at the home of defendant and his mother. As we see it, there is a logical inference, a strong one, that the pistols in the gun cabinet were taken at a time when someone, other than Mr. Maymon Beck or Mrs. Berry, unlocked the door and entered the house, and that the key left at the Berrys’ was the key by which the door was unlocked. As no one else had express authority, and there is no evidence of the exercise by anyone else of any implied authority, to unlock the door, it appears that such an unlocking and entry was for the purpose of stealing, when considered with the fact that two of the pistols were stolen from the gun cabinet, after the bottom compartment thereof had been prized open.
We conclude that the circumstances warrant a finding that there was a breaking by unlocking the door, and that defendant’s possession of two of the pistols soon after their being taken from the premises, in the absence of any explanation by him of the occasion for his possession of the guns, constitutes substantial, if not conclusive, evidence of defendant’s guilt of burglary in the second degree.
The court reasoned in Norman that if there had been any evidence tending to connect someone else, a person who might have had a right to have been in the office, with obtaining the examination papers and turning them over to defendant, defendant would not have been guilty of burglary, although he would have been guilty of larceny, or the like. The court, however, went on to state at 69 So. 365:
“. . . Here, however, there is no evidence whatever that defendant had such *1030 an accomplice; and certainly we are not required to presume, in the absence of such evidence, that defendant did have such an accomplice, in order to permit defendant to escape the incriminating features of the evidence as to the breaking, for such a presumption would amount to presuming another person’s guilt, of which there is no evidence, for the purpose of explaining away the incul-patory evidence against defendant of the burglary.”
In Norman, there was no evidence that defendant had access to a key to the office, but the evidence was “that the lock to the office was a cheap one and easy to fit with a key.”
Defendant’s motion to exclude the evidence was properly overruled, and there was no error in the overruling of defendant’s motion for a new trial.
We find no error in the record, and the judgment appealed from should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the New Judicial Article, (Constitutional Amendment No. 328). His opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.

. The evidence is not as clear as it should be as to the location of the room of Mr. Maymon Beck. The evidence was that he lived in the whole house and had a room of his own, but there is also evidence to the effect that the room was not in the house itself, but was out next to the garage.